T.C. Memo. 2011-152

UNITED STATES TAX COURT

SUSAN G. BELL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25055-08.                    Filed June 29, 2011.

<u>John W. Nelson</u>, for petitioner.

<u>Angela J. Kennedy</u> and <u>Derek W. Kaczmarek</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Petitioner filed the petition in this case in response to a so-called final appeals determination (notice of determination) concerning petitioner's request for relief from joint and several liability under section 6015[1] for her taxable

_____

[1]All section references are to the Internal Revenue Code in
                                        (continued...)

year 2003. We must decide whether petitioner is entitled to relief under that section for that year. We hold that she is to the extent stated herein.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time petitioner filed the petition in this case, she resided in Indiana.

Petitioner, who was born in 1951, completed the eleventh grade of school, although she took certain courses at a community college at times not established by the record. Petitioner does not have any educational background in business, finance, or Federal, State, or local tax law.

Around 1990, petitioner suffered a work-related back injury (petitioner's back injury) that resulted in a ruptured spinal disc and sciatic damage. During the period 1994 to 1997, petitioner received workers' compensation with respect to petitioner's back injury.

In 1995, petitioner underwent back surgery for petitioner's back injury during which metal rods were inserted in her back. Petitioner continued to receive certain medical treatment for petitioner's back injury until 1997. From around 2003 until the time of the trial in this case, petitioner did not maintain any

---

[1](...continued)
effect at all relevant times. All Rule references are to the Tax Court Rules of Practice and Procedure.

health insurance. Nor had petitioner sought treatment for any medical condition since 2008 because she was unable to afford any such treatment. As of the time of the trial in this case, petitioner continued to suffer from petitioner's back injury in that she was unable to stand, sit, walk, or lie down for long periods.

On April 15, 1995, petitioner married Thomas Bell (Mr. Bell), who was born around 1963. (We shall sometimes refer collectively to petitioner and Mr. Bell as the Bells.) The Bells do not have any children together. At no time during their marriage did Mr. Bell physically abuse petitioner.

During the Bells' marriage, petitioner did not maintain any bank account in her sole name, Mr. Bell maintained a bank account at Union Planters Bank (Mr. Bell's personal bank account) in his sole name, and the Bells did not maintain any bank account in their joint names. Although petitioner did not have signatory authority over Mr. Bell's personal bank account, she made deposits into, and reviewed bank statements of, that account. Mr. Bell paid from Mr. Bell's personal bank account, inter alia, all of the Bells' household bills. During 2003, Mr. Bell wrote certain checks drawn on Mr. Bell's personal bank account that were payable to petitioner and that totaled $13,500.

Around 1997, the Bells began operating a business (toy helicopter business) in which they sold toy helicopters at

certain air shows, festivals, and similar events around the country. For several years, the Bells traveled extensively each year in operating that business. Around 2002, petitioner told Mr. Bell that, because of petitioner's back injury, she was unable to travel for the toy helicopter business as she had in the past. In 2002, the Bells stopped operating the toy helicopter business.

On September 27, 2002, Mr. Bell incorporated under the laws of Indiana Today I Can, Inc. (Today I Can), which was to operate an Internet sales business and which it did until its dissolution at a time not established by the record. At all relevant times, that corporation was treated for Federal income tax (tax) purposes as an S corporation.

During the period 2002 to 2004, Mr. Bell and petitioner owned 51 percent and 49 percent, respectively, of the outstanding stock of Today I Can. During that period, Mr. Bell maintained total control over the operations and activities of that company. At no time was petitioner authorized to enter into any agreements or contracts on behalf of Today I Can.

At all relevant times, Today I Can maintained a bank account at Union Planters Bank (Today I Can bank account), over which petitioner did not have signatory authority. Although only Mr. Bell had signatory authority over that account, Mr. Bell gave to

Kent Shipley (Mr. Shipley), an attorney for Today I Can, a so-called signature stamp with Mr. Bell's signature so that Mr. Shipley was able to use that stamp on certain documents, including checks drawn on the Today I Can bank account.

At all relevant times, including during 2003, petitioner worked for Today I Can by performing certain administrative and bookkeeping tasks, including handling certain bills by, for example, drafting certain checks for Mr. Bell's signature, making certain appointments for Mr. Bell, taking certain customer orders, and providing certain customer service.

During 2003, Today I Can paid petitioner wages of $24,500 and withheld from those wages tax of $2,320.41. Today I Can reported those amounts in Form W-2, Wage and Tax Statement (Form W-2), that it issued to petitioner for her taxable year 2003. Petitioner deposited the wages that Today I Can paid her during 2003 into Mr. Bell's personal bank account.

During 2003, Today I Can paid Mr. Bell wages of $28,500 and withheld from those wages tax of $3,527.62. Today I Can reported those amounts in Form W-2 that it issued to Mr. Bell for his taxable year 2003.

On June 12, 2003, Today I Can filed Form 1120S, U.S. Income Tax Return for an S Corporation (Form 1120S), for its taxable period September 27 through December 31, 2002 (2002 Today I Can return). In that return, Today I Can reported gross receipts or

sales of $778,887, total income of $778,887, total deductions of $728,125, and ordinary income from trade or business activities of $50,762.  Today I Can attached to the 2002 Today I Can return Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc. (Schedule K-1), that it completed with respect to Mr. Bell. In that schedule, Today I Can reported that Mr. Bell owned 100 percent of its outstanding stock.

On September 11, 2003, the Bells jointly filed late Form 1040, U.S. Individual Income Tax Return (Form 1040), for their taxable year 2001 (2001 joint return).  In that return, the Bells claimed no withholding tax credit and showed tax due of $12,235. When the Bells filed the 2001 joint return, a check for $12,719.99 that was drawn on Mr. Bell's personal bank account was included with that return.[2]

On September 16, 2003, the Bells jointly filed late Form 1040 for their taxable year 2002 (2002 joint return).  In that return, the Bells claimed no withholding tax credit and showed tax due of $83,475.  When the Bells filed the 2002 joint return, a check for $20,000 that was drawn on Mr. Bell's personal bank account was included with that return.

On October 18, November 3, and November 22, 2003, Mr. Bell sent to the Internal Revenue Service (Service) payments of

---

[2]The record does not establish why a check for $12,719.99 was included with the 2001 joint return when that return showed tax due of only $12,235.

$5,522, $15,000, and $279, respectively.  The Service applied each of those payments against a portion of the Bells' unpaid tax for their taxable year 2002.

On November 22, 2003, the Bells jointly filed late Form 1040 for their taxable year 1999.

On December 1, 2003, Mr. Bell sent to the Service a payment of $4,551.17 that the Service applied against a portion of the Bells' unpaid liability for their taxable year 2001.[3]  On December 13, 2003, Mr. Bell sent to the Service a payment of $10,000 that the Service applied against a portion of the Bells' unpaid tax for their taxable year 2002.

On December 25, 2003, the Bells separated, and Mr. Bell moved from the marital residence in Indiana (marital residence) to Florida.  At that time, Mr. Bell took the checkbook for the Today I Can bank account, and petitioner ceased to have access to that checkbook.

On January 20, 2004, Mr. Bell sent to the Service a payment of $549.12 that the Service applied against a portion of the Bells' unpaid tax for their taxable year 1999.  On January 31, 2004, Mr. Bell sent to the Service a payment of $1,000 that the

---

[3]As discussed above, the Bells filed late the 2001 joint return and paid late the tax shown due in that return.  Although the record does not establish the Bells' unpaid liability for their taxable year 2001, we presume that that liability consisted of additions to tax for failure to file timely a return for that taxable year and failure to pay timely the tax shown due in that return as well as interest thereon as provided by law.

Service applied against a portion of the Bells' unpaid tax for their taxable year 2002.

On March 15, 2004, Today I Can filed Form 1120S for its taxable year 2003 (2003 Today I Can return). In that return, Today I Can reported gross receipts or sales of $2,042,913, total income of $2,040,413, total deductions of $1,833,385, and ordinary income from trade or business activities of $207,028. Today I Can attached to the 2003 Today I Can return Schedule K-1 that it completed with respect to Mr. Bell (2003 Schedule K-1). In that schedule, Today I Can reported that Mr. Bell owned 100 percent of its outstanding stock.

On March 23, 2004, Mr. Bell commenced in the Marion County Superior Court (Superior Court) a divorce proceeding against petitioner.

On March 29, 2004, Mr. Bell sent to the Service a payment of $4,000 that the Service applied against a portion of the Bells' unpaid tax for their taxable year 2002. After the Service applied that payment against that unpaid tax, the Bells' remaining unpaid tax for their taxable year 2002, including certain penalties and interest, totaled approximately $40,500.

On July 10, 2004, petitioner and Mr. Bell executed and filed with the Superior Court a property settlement agreement (property agreement) in which the Bells agreed to settle all of their respective rights to property arising out of their marriage.

Pursuant to the property agreement, petitioner was to receive a Ford Expedition automobile (Ford Expedition) that was then in her possession and was to have exclusive possession of the marital residence and to make all payments on the mortgage loan with respect to that residence. The property agreement also provided:

4. Today I Can, Inc.: Husband [Mr. Bell] shall re-
tain all interest in the business, Today I Can,
Inc. Wife [petitioner] agrees to sell any and all
shares she owns in Today I Can, Inc. back to Today
I Can, Inc. She will be paid ONE MILLION DOLLARS
($1,000,000.00) according to the Promissory Note
that is attached hereto and incorporated herein as
Exhibit "A".[4] Wife agrees that this will be in
complete satisfaction of any and [all] claims she
has to either Husband's interest in Today I Can,
Inc. and/or her individual interest in Today I
Can, Inc.

\* \* \* \* \* \* \*

6. Tax Liability and General Indemnification: Hus-
band specifically agrees to indemnify and hold
Wife harmless from any federal or state tax lia-
bility arising out of actions or omissions during
their marriage and/or arising out of actions or
omissions related to Today I Can, Inc., including
the cost of Wife's defense and attorney's fees or,
at Wife's option, the assumption of her defense.
\* \* \*

\* \* \* \* \* \* \*

8. Knowledge and Disclosure: Each party acknowledges
that they understand he or she is entitled to
thorough discovery, analysis, and investigation of
the other party's financial information and all
data and facts relevant to the dissolution pro-
ceeding. Each party certifies that he or she has

---

[4]As discussed below, for reasons not established by the record, Mr. Bell signed the promissory note for $1 million before he and petitioner executed and signed the property agreement.

full and adequate knowledge of all such relevant
financial information, data, and facts in order to
make a knowing, and voluntary decision to sign
this Agreement at this time.

On August 19, 2004, the Superior Court approved the property agreement and entered a decree of divorce dissolving the Bells' marriage.

On June 11, 2004, Mr. Bell executed an installment promissory note (2004 installment note) in the amount of $1 million that was payable to petitioner. That note was the note to which paragraph 4 of the property agreement (quoted above) referred. The 2004 installment note, which did not bear interest, provided that Mr. Bell was to make payments to petitioner on that note as follows:

Upon the 5th day of August 2004 and then the 5th day of
each month thereafter until paid in full, monthly
payments in the amount of Ten Thousand Dollars
($10,000.00) or until the expiration of 9 years from
the effective date, whichever occurs earlier.

The 2004 installment note also provided that if Mr. Bell were to fail to make any payment within ten days of the date on which that payment was due, he would be in default and any delinquent payment would accrue interest at the rate of 5 percent per year until paid. As of April 2, 2008, Mr. Bell had not made any payments under the 2004 installment note.

On July 29, 2004, the Bells jointly filed late respective Forms 1040 for their taxable years 1997, 1998, 2000 (2000 joint return), and 2003 (2003 joint return). In the 2000 joint return,

the Bells claimed no withholding tax credit and showed tax due of $6,690. When the Bells filed that return, a check for $1,000 that was drawn on Mr. Bell's personal bank account was included with that return.

In the 2003 joint return that the Bells filed jointly on July 29, 2004, the Bells reported, inter alia, (1) wages of $53,000,[5] (2) net business income of $2,195 from certain work Mr. Bell performed on behalf of Today I Can, (3) net income of $187,234[6] from Today I Can, (4) adjusted gross income of $242,274, and (5) taxable income of $222,496. In that return, the Bells (1) showed tax of $54,869 and self-employment tax of $310, (2) claimed a withholding tax credit of $5,848,[7] and (3) showed tax due of $50,587.[8] The Bells did not attach to the

-----

[5]The wages of $53,000 that the Bells reported in the 2003 joint return consisted of the $24,500 and the $28,500 that Today I Can paid petitioner and Mr. Bell, respectively, during 2003.

[6]The net income of $187,234 from Today I Can that the Bells reported in the 2003 joint return consisted of the difference between ordinary income from trade or business activities of $207,028 and a deduction under sec. 179 of $19,794.

[7]The $5,848 withholding tax credit that the Bells claimed in the 2003 joint return consisted of $2,320.41 and $3,527.62, respectively, that Today I Can withheld from the respective wages that it paid petitioner and Mr. Bell during 2003. We note that the Bells rounded to the nearest dollar the amount of the withholding tax credit that they claimed in the 2003 joint return.

[8]The tax due shown in the 2003 joint return included an estimated tax penalty of $1,256.

2003 joint return the 2003 Schedule K-1.  When the Bells filed that return, no payment was included.

On March 15, 2005, Today I Can filed Form 1120S for its taxable year 2004 (2004 Today I Can return).  In that return, Today I Can reported gross receipts or sales of $2,103,124, total income of $2,106,344, total deductions of $2,078,880, and ordinary business income of $27,464.  Today I Can attached to the 2004 Today I Can return respective Schedules K-1 that it completed with respect to petitioner and Mr. Bell.  In those schedules, Today I Can reported that petitioner and Mr. Bell owned 21 percent and 79 percent, respectively, of its outstanding stock.

After August 19, 2004, the date on which the Superior Court entered the decree of divorce dissolving the Bells' marriage, petitioner and Mr. Bell continued to operate an Internet sales business.  Petitioner continued that business with Mr. Bell because (1) she did not have any other source of income and (2) Mr. Bell maintained the business contacts and relationships necessary for that business to succeed.

Around 2006, petitioner and Mr. Bell started a company known as Earn and Learn which operated an Internet sales business substantially identical to the business that Today I Can had operated.  Earn and Learn was dissolved around 2008.  Petitioner has not been employed since Earn and Learn was dissolved in 2008.

On July 26, 2007, petitioner filed Form 8857, Request for Innocent Spouse Relief (Form 8857), with respect to her taxable year 2003. Petitioner included with that form Form 12510, Questionnaire for Requesting Spouse (Form 12510). In Form 12510, petitioner claimed (1) that she did not review the 2003 joint return before signing it, (2) that she first became aware of the unpaid tax for her taxable year 2003 "When the IRS contacted me for an audit", and (3) that Mr. Bell verbally and mentally abused her.

In petitioner's Form 12510, petitioner claimed total monthly income of $7,899 consisting of monthly wages of $2,249 and monthly self-employment income of $5,650. In that form, petitioner claimed total monthly expenses of $5,356 consisting of:

| Claimed Monthly Expenses | Amount |
|---|---|
| Federal, State, and local taxes | $2,249 |
| Rent or mortgage | 1,123 |
| Food | 300 |
| Utilities | 400 |
| Telephone | 300 |
| Car (including insurance and gasoline and repairs) | 384 |
| Medical expenses | 350 |
| Clothing | 250 |
| Total | 5,356 |

On September 10, 2007, petitioner filed timely Form 1040 for her taxable year 2006 (2006 return). In that return, petitioner reported, inter alia, adjusted gross income of $246,865 and

taxable income of $233,172. In the 2006 return, petitioner showed total tax of $63,538 and tax due of $59,668. When she filed that return, petitioner included a payment of $59,668.

On October 8, 2007, respondent sent to petitioner a statutory notice of balance due with respect to certain additions to tax and interest totaling $3,824.94 that respondent had assessed for petitioner's taxable year 2006. On October 9, 2007, petitioner sent to the Service a payment of $3,824.94.

An examiner working for the Service (respondent's examiner) prepared an examination workpaper dated November 2, 2007 (examination workpaper) with respect to petitioner's request for relief under section 6015 for her taxable year 2003. In that workpaper, respondent's examiner concluded that petitioner is not entitled to relief under that section for any portion of the underpayment for that year. The examination workpaper stated, inter alia:

### GENERAL INFORMATION

2003/UP [underpayment]/denied relief - no hardship - has ability to make payments - considered abuse (however not a strong factor for granting relief) - considered health issues (RS has ability to work & pay tax based on 2006 return) - part attributable to NES [non-electing spouse] - knew NES has a history of not paying tax - no belief - owes on prior joint returns - helped with business - drafted checks for business - received benefit through the divorce.

\* \* \* \* \* \* \*

**EVALUATION PROCESS**

**Year 2003**

**IRC 6015(f)**

Liability arose on or after July 22, 1998
Joint return is valid
There is enough information to determine the claim
No OIC accepted

**Eligibility factors:**
Underpayment of tax - relief is not available under IRC
6015(b) & 6015(c)
Filed a joint return
Claim filed timely
Liability unpaid, or RS [requesting spouse] may have
refundable payments
Not a fraudulent return
No fraudulent transfer of assets
No disqualified assets transferred
The underpaid tax is not solely attributable to the NRS
[nonrequesting spouse]
Attribution:   NES = 46,733.00
               RS = 2,598.00
Partial attribution to the NRS.  Continue evaluating
for the portion attributable to the NRS.  Deny relief
for the portion attributable to the RS.

**Tier I factors (limited scope):**
Taxpayers are currently divorced, widowed, legally
separated, or they had been members of separate house-
holds prior to the claim for at least 12 consecutive
months
Can't prove a belief that tax was to be paid
Explanation:   History of filing returns late with
               balance dues [sic] - owes on prior joint
               returns - when return was filed - did
               not have access to NES' ability to pay

**Tier I factors (limited scope) not met**

**Tier II factors:**
Taxpayers are currently divorced, widowed,                **For**
legally separated, or they had been members of
separate households prior to the claim for at
least 12 consecutive months
No economic hardship                                    **Against**
Explanation:   Per Form 12510 - has ability to make

payments - received 1,000,000.00 in 2004 for her shares for NES' business

Marital abuse                                    **For**[9]

Explanation:   States mental & verbal abuse (not con-sidered strong factor for granting re-lief) - RS worked for NES' business

Poor mental or physical health

**For**[10]

Explanation:   RS has back trouble & depression - how-ever RS is [sic] ability to work

NRS has legal obligation                         **For**

Legal Obligation: Per divorce decree NES is to pay tax

**Knowledge:**

Background:

  RS - High school - culinary    NRS - Tenth grade school

Involvement:

  RS - States no joint        NRS -
       accounts - states she
       reviewed statements -
       worked for business -
       clerical/administrative
       work - includes review-
       ing bills & drafting
       checks for NES' signa-
       ture

Lifestyle changes:     Not indicated
NRS's elusiveness:     Did not ask questions
Duty to inquire:       Did not review return
Living arrangements:   Separated 12/25/03

RS had no knowledge and no reason to know      **For**[11]

Explanation:   History of filing late returns with balance due - owes on prior year joint returns - when return filed - did not have access to NES' ability to pay

---

[9]An individual not identified in the record struck by hand the typewritten word "For" in the examination workpaper.

[10]An individual not identified in the record struck by hand the typewritten word "For" in the examination workpaper.

[11]An individual not identified in the record struck by hand the typewritten word "For" in the examination workpaper and inserted by hand the word "Against" immediately above it.

RS gained benefit                                          **Against**
Explanation:    Received 1,000,000.00 for her shares of
                business - received marital home through
                divorce
Made a good faith effort to comply with the tax     **For**
laws
Explanation:    All future returns filed & paid - made
                estimated payment on 2007
Unique circumstances: Although RS states health issues
                      - RS still has ability to earn
                      wages to pay taxes
Not meeting Tier II factors - deny claim
Tier II consideration:   Based on the above facts it is
                         equitable to hold the RS lia-
                         ble for the balance.

**Tier II factors not met - deny**
**Claim denied under IRC 6015(f) - full scope**

**CONCLUSION**

2003 - Denied under 6015(f)

On November 14, 2007, respondent issued to petitioner a

preliminary determination with respect to her request for relief

under section 6015 for her taxable year 2003.  In that letter,

respondent determined that petitioner is not entitled to that

relief because "you [petitioner] did not show it would be unfair

to hold you responsible.  You did not prove, that at the time you

signed the return, you had reason to believe the tax would be

paid.  Also, the documentation you provided does not prove

economic hardship."

Around November 27, 2007, Mr. Bell commenced a bankruptcy

proceeding in the U.S. Bankruptcy Court for the Middle District

of Florida (Bankruptcy Court).  On April 2, 2008, petitioner

filed in the Bankruptcy Court an adversary complaint (peti-

tioner's bankruptcy complaint) in that proceeding. In that complaint, petitioner alleged that Mr. Bell's obligations under (1) the 2004 installment note and (2) the indemnification contained in paragraph 6 of the property agreement were nondischargeable in bankruptcy. In petitioner's bankruptcy complaint, petitioner alleged, inter alia:

> 5. During the period from approximately 2000 through 2004, while still married, Debtor [Mr. Bell] and Sue [petitioner] were partners in a business called Today I Can, Inc. ("TIC") whose primary purpose was internet sales/e-commerce. Further, TIC was organized under the laws of the State of Indiana.

> 6. The ownership structure of TIC was 51-49%, with Debtor holding the majority interest and Sue holding the minority interest.

>     *       *       *       *       *       *       *

> 22. Prior to the filing of the instant bankruptcy, Sue had instituted post-dissolution legal proceedings in Indiana (Marion County) against Debtor for the purpose of collecting on the Note and that said proceedings were then-pending at the time of the filing of this bankruptcy. Moreover, during the last half of 2007, Debtor had appeared in Indiana twice for hearings on said legal matter and that further hearings were scheduled.

> 23. Nevertheless, Debtor failed to disclose said litigation as required under question no. 4 of his Statement of Financial Affairs.

On April 30, 2008, Mr. Bell filed in the Bankruptcy Court an answer to petitioner's bankruptcy complaint. In that answer, Mr. Bell admitted the allegations that petitioner made in paragraphs 5, 6, 22, and 23 of that complaint (quoted above).

Around early 2008, respondent assigned petitioner's request for relief under section 6015 to an officer (respondent's Appeals officer) in respondent's Appeals Office. After considering petitioner's request for relief, respondent's Appeals officer prepared an appeals case memorandum dated June 27, 2008 (appeals memorandum). In that memorandum, respondent's Appeals officer concluded that petitioner is not entitled to relief under section 6015 for her taxable year 2003. The appeals memorandum stated in pertinent part:

### SUMMARY AND RECOMMENDATION

Is the taxpayer entitled to relief from liability under §6015(f)? There are hazards for both sides so an offer was presented to the taxpayer, but she has ignored the offer. She has not countered with an offer of her own, either. Accordingly, the examiner's position will be sustained.

### BRIEF BACKGROUND

Taxpayer filed a joint income tax return with her spouse for tax year 2003 on or about July 29, 2004. An underpayment was reported on the form 1040 in the amount of $50,587. Additional penalties and interest were assessed because the tax return was filed after the due date of April 15, 2004.

The taxpayer and her former spouse were equal partners in a corporation and both earned wages during 2003. He had an additional sole proprietorship during the year. After allocating the tax liability, her former spouse's share of the unpaid tax was $24,961.

### DISCUSSION AND ANALYSIS

* * * * * * *

The taxpayer cites O'Neill v. CIR (TC Memo 2004-183) and discusses 6 factors that favor her in the determi-

nation that she should be granted innocent spouse relief under §6015(f).[12]  The factors discussed by the Court are listed below with the taxpayer's position on each factor explained.

1. Marital Status
   The couple was divorced August 2005.

2. Economic Hardship
   The taxpayer completed form 12510 and calculated her current monthly household income and expenses. She has about $2500 available income each month. She did not receive the $1 million divorce settlement from her former spouse.  He has listed this as an outstanding debt on his bankruptcy filings.

3. Abuse
   The taxpayer completed form 12510 and stated that she was the victim of mental and verbal abuse. The divorce decree does not give a reason for the marital troubles; it only accepts the property settlement and grants the dissolution.

4. Knowledge
   The taxpayer was aware of their income tax liability.  She knew that they had not filed income tax returns for several years and were attempting to become current during 2003 and 2004 calendar years.  Many of these returns were filed late and with balances due.  They have outstanding liabilities in excess of $40,000 from their 2000 and 2002 tax returns.

---

[12]We note that in O'Neill v. Commissioner, T.C. Memo. 2004-183, we analyzed the taxpayer's request for relief under sec. 6015(f) under the factors set forth in Rev. Proc. 2000-15, 2000-1 C.B. 447 (Revenue Procedure 2000-15).  We also note that Rev. Proc. 2003-61, 2003-2 C.B. 296 (Revenue Procedure 2003-61), superseded Revenue Procedure 2000-15.  Revenue Procedure 2003-61 is effective for requests for relief under sec. 6015(f) that were filed on or after Nov. 1, 2003.  Id. sec. 7, 2003-2 C.B. at 299. Revenue Procedure 2003-61 is applicable in the instant case because petitioner filed her request for innocent spouse relief on July 26, 2007.

5. Divorce decree
   The property settlement states that the former spouse will hold the taxpayer harmless from any federal tax liability arising during their marriage. The couple had filed the 2003 form 1040 about 1 year prior to the divorce being granted. She must have been aware that he had not paid the tax liabilities for that statement to be included in the decree.

6. Tax Liability
   The taxpayer believes that all of the income reported on the 2003 tax return belongs to her former spouse. The taxpayer reported wages earned during 2003 and listed her occupation as a business owner. At least some of the wages reported as income on the tax return belonged to the taxpayer. The property settlement along with the taxpayer's occupation on the 2003 tax return indicates that she was involved in the business. She was identified as a 50% owner of the company.

7. Significant Benefit
   The taxpayer was granted a $1 million property settlement for her share of the corporation, title to the Ford Expedition (listed as a corporate asset), and sole title to the couple's personal residence. She lived with her former spouse until Christmas Day 2003.

8. Current Status
   The taxpayer has filed her 2004-2006 tax returns. There are no outstanding liabilities at this time. She made estimated payments for the 2007 tax year.

The first factor is neutral or favors the Government because the couple were married and living together all but 1 week of 2003. They were separated while the tax return was prepared and at the time it was filed with the Service.

The second factor is neutral or favors the Government because the taxpayer has sufficient net income each month to pay some of the liabilities.

The third factor is neutral. There isn't any evidence of abuse during the marriage. The divorce decree is silent on this topic.

The seventh factor is neutral.  Neither individual received a significant benefit during the marriage from the unpaid taxes.  Both enjoyed the same lifestyle.

The 6th factor favors the Government because the business was owned by both individuals equally.  The taxpayer was granted a large settlement for her share of the business at the time of the divorce.  The income reported by the corporation should be split between them.

The fourth factor favors the Government because the taxpayer was aware that the couple had unpaid liabilities at the time she signed the 2003 form 1040.  She was aware that there were amounts owed on that return along with others that had been filed within the last year.

The fifth factor favors the taxpayer because the decree holds the former spouse liable for taxes owed during the marriage.  He agreed to be responsible for the unpaid taxes.  Whether or not the taxpayer believed this to be true, this is not known.

The eighth factor favors the taxpayer.  She has been current in filing and paying her tax liabilities since the couple separated.

3 out of 8 factors favor the taxpayer while 2 are considered neutral.  This would allow the taxpayer 5 out of 8 factors on her side, or 60% concession by the Government.

**MY EVALUATION**

I believe that there are hazards of litigating this issue for both sides.  There are factors that favor the taxpayer and others that favor the Government.  Although an offer was presented to the taxpayer, she has refused it and decided not to counter it with an offer of her own.  I recommend that the examiner's position should be sustained in full.

On July 11, 2008, respondent issued to petitioner the notice of determination.  In that notice, respondent denied petitioner's request for relief under section 6015 for her taxable year 2003.

The notice of determination stated in pertinent part:  "The information we have available does not show you meet the requirements for relief."

On October 20, 2008, petitioner filed Form 1040 for her taxable year 2007 (2007 return).[13]  In that return, petitioner reported adjusted gross income of $133,361 and taxable income of $103,191.  In the 2007 return, petitioner showed total tax of $26,644 and claimed (1) a withholding tax credit of $13,847, (2) estimated tax payments totaling $22,500, and (3) a refund of approximately $9,700.  On November 17, 2008, respondent (1) assessed against petitioner an estimated tax penalty of $136.03 with respect to her taxable year 2007 and (2) issued to her a refund of $9,566.97 with respect to that year.

In May 2009, petitioner moved from the marital residence to live with her older sister in Idaho.  Petitioner made that move because she could no longer afford to live in Indiana and required assistance from family members who lived in Idaho.  From at least May 2009 until the time of the trial in this case, petitioner's sister, who was suffering from certain medical conditions including type II diabetes, back injuries, severe asthma, and severe arthritis, was unemployed and was receiving

---

[13]Petitioner received an extension of time within which to file the 2007 return to and including Oct. 15, 2008.

Social Security disability payments.[14]  At the time of the trial in this case, petitioner's sister contributed $600 monthly toward the household expenses of petitioner and herself.

At the time petitioner moved to Idaho in May 2009, she informed Wells Fargo Bank, N.A. (Wells Fargo), the trustee for the holders of the mortgage loan with respect to the marital residence, that she was unable to make further payments on that mortgage loan and that she would surrender possession of that residence.  Around November 18, 2009, Wells Fargo instituted a foreclosure proceeding against petitioner in the Hamilton Superior Court and filed a document in that court entitled "AMENDED COMPLAINT ON NOTE AND FOR FORECLOSURE OF MORTGAGE" with respect to the marital residence.

On November 30, 2009, petitioner and Mr. Bell entered into a settlement agreement and release (bankruptcy settlement) with respect to the claims that petitioner had made in petitioner's bankruptcy complaint, which the Bankruptcy Court approved on November 30, 2009.[15]  That settlement provided in pertinent part:

> 1.   On August 19, 2004, Susan [petitioner] and Thomas [Mr. Bell] were granted a divorce under the laws of the State of Indiana (the "**divorce**").  Pursuant to

[14]As of the time of the trial in this case, petitioner had applied for Social Security disability benefits but had not received any response as to whether she qualified for such benefits.

[15]Mr. Bell and petitioner executed the bankruptcy settlement on Sept. 14 and Oct. 5, 2009, respectively.

the divorce, Susan and Thomas entered into a Property Settlement Agreement (the **"PSA"**) which outlined their rights and obligations with respect to property, income and assets related to their marriage. This Agreement hereby incorporates said PSA by reference, including a certain $1,000,000.00 promissory note dated June 11, 2004 (the **"Note"**).

     *       *       *       *       *       *       *

8. <u>Scope of Agreement</u>. The Parties hereby agree that this Agreement is intended to address Thomas' liability with respect to the PSA, specifically including the Note and all federal and/or state tax liability with respect to a certain internet business in which Thomas and Susan were partners during their marriage, namely, Today I Can, Inc. (**"TIC"**).

9. <u>Payment terms</u>. Subject to the satisfaction of the contingencies set forth under paragraph seven (7) above,[16] the Parties hereby agree that Thomas shall pay Susan the total sum of Three Hundred Twenty Five Thousand Dollars and no cents ($325,000.00) (hereinafter the **"Settlement Amount"**) in full accord and satisfaction of his obligations under the Note. Subject to the "Method of Payment" set forth under paragraph (10) below, Thomas hereby agrees to pay the Settlement Amount as follows:

> (a) A lump sum payment of Ten Thousand Dollars ($10,000.00) to be paid not later than October 5, 2009; and
>
> (b) Commencing on November 5, 2009, Thomas shall pay Susan the sum of Four Thousand Two Hundred Fifty Dollars ($4,250.00) per month for twelve (12) consecutive monthly installment payments ($51,000.00 total), and
>
> (c) Commencing on November 5, 2010, Thomas shall pay Susan the sum of Three Thousand Dollars ($3,000.00) per month for eighty-eight (88) consecutive monthly installment payments ($264,000.00 total).

---

[16]The contingencies set forth in par. 7 of the bankruptcy settlement were satisfied.

The aggregate total of the payments described under paragraphs 9(a), (b) and (c) above amount to the Settlement Amount of Three Hundred Twenty Five Thousand Dollars ($325,000.00).  The last such payment of the Settlement Amount shall be due and owing on February 5, 2018.  All payments shall be due on the fifth day of each month.

The Parties agree Thomas is solely responsible for the payments set forth under this paragraph.

10.  <u>Method of Payment</u>.  The payments due under paragraph nine shall be made as follows:

(a)  The lump-sum payment of $10,000.00, due October 5, 2009, shall be made payable to "Susan G. Bell and John Nelson" and shall be mailed to the following address:  John W. Nelson, Esquire, * * * and

(b)  The first <u>seven</u> payments of $4,250.00, which commence on November 5, 2009, shall be made payable to "Susan G. Bell and John Nelson," and shall be mailed to the following address:  John W. Nelson, Esquire, * * * and

(c)  The remaining <u>five</u> payments of $4,250 as well as <u>all</u> payments of $3,000.00 shall be made payable to "Susan G. Bell" and shall be mailed to Susan at an address to be provided to Thomas at least thirty (30) days prior to the commencement of the first such payment.  * * *

*        *        *        *        *        *        *

11.  <u>Taxes</u>.  Thomas agrees that he shall remain subject to all tax liability related to TIC as set forth under the PSA.  Further, Thomas agrees to indemnify Susan for any TIC related tax liability that is ultimately assessed against her.  As such, Thomas hereby ratifies and reaffirms all TIC tax indemnification provisions as set forth under the PSA.

12.  <u>Default</u>.  The Parties agree that in the event Thomas fails to fully satisfy his obligations under this Agreement, he shall be in default of this Agreement.  The Parties hereby agree that the occurence of any of the following shall constitute an event of

default: (a) Thomas' failure to make any payment due under this Agreement by the due date scheduled for any such payment, as set forth under paragraph nine above; (b) Thomas' failure to timely indemnify Susan for any tax payments made by Susan relating to TIC, as described under the PSA, as set forth under paragraph ten above * * * and (c) payment of any amount less than the scheduled amount. In the event Thomas is in default with respect to any payment scheduled hereunder, he shall have ten (10) calendar days following the applicable due date in which to cure such default, provided that Susan is in receipt of any such payment not later than 12:00 midnight on the tenth calendar day following the due date. In the event of default and/or failure to timely cure such default, the terms of this Agreement shall become null and void and the terms of the Note shall revive and be of full legal force and effect.

From around October 2009 through around January 2010, Mr. Bell paid petitioner $19,500 pursuant to the bankruptcy settlement. Of that $19,500, petitioner used $9,000 to pay her attorney. From around February 2010 to the time of the trial in this case, Mr. Bell did not make any monthly payments pursuant to the bankruptcy settlement. As of the time of that trial, petitioner had not initiated any legal action to enforce the terms of the bankruptcy settlement; nor had she taken any legal action to enforce the terms of the 2004 installment note, which she had the right to do under the bankruptcy settlement in the event Mr. Bell defaulted on that settlement.

As of April 19, 2010, the Bells owed a balance of $11,963.39 with respect to their taxable year 2000. As of that date, the Bells owed a balance of $36,895.25 with respect to their taxable year 2002.

At the time of the trial in this case, petitioner, who remained unemployed, was still residing in Idaho with her older sister. From the time petitioner moved to Idaho in May 2009 until the time of that trial, the only funds that petitioner had available on which to live were the payments that Mr. Bell had made pursuant to the bankruptcy settlement from October 2009 to January 2010 totaling $19,500 and certain savings, the amount of which is not established by the record.[17] At the time of the trial, petitioner's savings had been reduced to approximately $100.

At the time of the trial in this case, petitioner's monthly expenses included expenses for (1) rent of $875, (2) utilities, including electric, gas, telephone, water, and trash, of $425, and (3) food of $350. At that time, petitioner had certain outstanding bills in amounts not established by the record for medical care that had been provided to her before 2008.

## OPINION

The parties' only dispute is whether petitioner is entitled to relief under section 6015(f) for her taxable year 2003.[18] Petitioner bears the burden of proving that she is entitled to

---

[17]As discussed above, at the time of the trial in this case, petitioner's sister was receiving Social Security disability benefits and was contributing $600 monthly toward the household expenses of petitioner and herself.

[18]Petitioner does not dispute that she is not entitled to relief under sec. 6015(b) or (c) for her taxable year 2003.

such relief.  See Rule 142(a); <u>Jonson v. Commissioner</u>, 118 T.C. 106, 113 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Section 6015(f) provides:

SEC. 6015.  RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.

(f)  Equitable Relief.--Under procedures prescribed by the Secretary, if--

(1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either); and

(2) relief is not available to such individual under subsection (b) or (c), the Secretary may relieve such individual of such liability.

As directed by section 6015(f), the Commissioner of Internal Revenue (Commissioner) has prescribed procedures in Revenue Procedure 2003-61 that are to be used in determining whether it would be inequitable to find the requesting spouse liable for part or all of the underpayment of tax.  Section 4.01 of that revenue procedure lists the following threshold conditions (threshold conditions) which must be satisfied before the Commissioner will consider a request for relief under section 6015(f): (1) The requesting spouse filed a joint tax return for the taxable year for which such spouse seeks relief; (2) relief is not available to the requesting spouse under section 6015(b) or (c); (3) the requesting spouse applies for relief no later than two years after the date of the Service's first collection activity after July 22, 1998, with respect to the requesting

spouse; (4) no assets were transferred between the spouses as part of a fraudulent scheme by the spouses; (5) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; (6) the requesting spouse did not file or fail to file the tax return in question with fraudulent intent; and (7) the income tax liability from which the requesting spouse seeks relief is attributable to an item of the nonrequesting spouse. Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297.

Respondent argues that petitioner has failed to satisfy the threshold condition in section 4.01(7) of Revenue Procedure 2003-61 with respect to the respective portions of the underpayment for her taxable year 2003 that are attributable to (1) 49 percent of the net income of $187,234 from Today I Can that the Bells reported in the 2003 joint return and (2) petitioner's wages of $24,500 that the Bells reported in that return. Petitioner disagrees and argues that she satisfies all of the threshold conditions with respect to the entire underpayment for her taxable year 2003.

With respect to the net income of $187,234 from Today I Can (2003 Today I Can net income) that the Bells reported in the 2003 joint return, respondent contends that 49 percent of that income is attributable to petitioner because during 2003 petitioner owned 49 percent of the stock of Today I Can. In support of that contention, respondent relies on (1) the allegations that peti-

tioner made in paragraphs 5 and 6 of petitioner's bankruptcy complaint that between 2000 and 2004 she owned 49 percent of the stock of Today I Can and (2) Mr. Bell's admission of those allegations in the answer to petitioner's bankruptcy complaint that he filed in the Bankruptcy Court.

Petitioner contends that Mr. Bell owned 100 percent of Today I Can and that therefore the 2003 Today I Can net income is attributable entirely to him. In support of that contention, petitioner relies on the 2003 Schedule K-1 in which Today I Can reported that Mr. Bell owned 100 percent of its outstanding stock. Petitioner claims that in signing the 2003 joint return she agreed with what was reported in that Schedule K-1; namely, Mr. Bell owned 100 percent of the stock of Today I Can.[19] In advancing that claim, petitioner ignores that the Bells did not attach to their 2003 joint return the 2003 Schedule K-1. As a result, petitioner could not have even been aware that Today I Can had reported in that Schedule K-1 that Mr. Bell owned 100 percent of the stock of Today I Can. Even if petitioner had been aware that Today I Can had reported in the 2003 Schedule K-1 that Mr. Bell owned 100 percent of that stock, we have held that "a tax return does not establish the truth of the facts stated

---

[19]Petitioner relies on Jones v. Commissioner, T.C. Memo. 2010-112, in support of her claim that in signing the 2003 joint return she agreed with the 2003 Schedule K-1. We find Jones to be materially distinguishable from the instant case and petitioner's reliance on that case to be misplaced.

therein."  <u>Campbell v. Commissioner</u>, T.C. Memo. 2011-15 (citing <u>Wilkinson v. Commissioner</u>, 71 T.C. 633 (1979)).

More importantly, petitioner herself disputed what Today I Can reported in the 2003 Schedule K-1.  In petitioner's bankruptcy complaint, petitioner indicated that during 2000 through 2004 she owned 49 percent of the stock of Today I Can.  In Mr. Bell's answer to that complaint Mr. Bell agreed with that statement.

In further support of petitioner's contention that the 2003 Today I Can net income is attributable entirely to Mr. Bell, petitioner relies on section 4.01(7)(b) of Revenue Procedure 2003-61.  That section provides in pertinent part:

> (b) *Nominal ownership*.  If the item is titled in the name of the requesting spouse, the item is presumptively attributable to the requesting spouse.  This presumption is rebuttable.[20] * * *

-------

[20]Sec. 4.01(7)(b) of Revenue Procedure 2003-61 also provides an example (nominal ownership example) of circumstances that would establish that a requesting spouse's ownership was nominal:

> For example, H opens an individual retirement account (IRA) in W's name and forges W's signature on the IRA in 1998.  Thereafter, H makes contributions to the IRA and in 2002 takes a taxable distribution from the IRA. H and W file a joint return for the 2002 taxable year, but do not report the taxable distribution on their joint return.  The Service later proposes a deficiency relating to the taxable IRA distribution and assesses the deficiency against H and W.  W requests relief * * * under section 6015.  W establishes that W did not contribute to the IRA, sign paperwork relating to the IRA, or otherwise act as if W were the owner of the IRA.  W thereby rebutted the presumption that the IRA is attributable to W.

According to petitioner, "the 51/49 allocation cited by Respondent establishes * * * a presumption that petitioner owned 49% of the TIC [Today I Can] [stock] which can be rebutted by evidence that any such interest was nominal". Petitioner claims that she has, in fact, rebutted that presumption by showing that her ownership interest in Today I Can was nominal because "Mr. Bell wielded total control over the business" and "petitioner's role with TIC was extremely limited".[21] Even if petitioner were correct that Mr. Bell controlled Today I Can, we would reject petitioner's contention that her ownership interest in that company was nominal. The nominal ownership example set forth in section 4.01(7)(b) of Revenue Procedure 2003-61 is instructive. In that example, the requesting spouse established that she did not "act as if * * * [she] were the owner of the IRA." Id. In the instant case, petitioner acted as if she were an owner of Today I Can when she sold her stock in that business to Mr. Bell as part of the divorce proceedings between her and Mr. Bell. In this regard, we have found (1) that petitioner and Mr. Bell

---

[21]Petitioner relies on Wilson v. Commissioner, T.C. Memo. 2010-134, in support of her claim that her ownership interest in Today I Can was nominal because Mr. Bell wielded control over that company and her role in that company was limited. In Wilson, we addressed whether one-half of the income from an unincorporated business operated by the nonrequesting spouse should be attributed to the requesting spouse solely because the requesting spouse had performed certain clerical work as an employee of that business. We find Wilson to be materially distinguishable from the instant case and petitioner's reliance on that case to be misplaced.

executed and filed with the Superior Court the property agreement and (2) that that agreement provided, inter alia, that Mr. Bell was to pay to petitioner $1 million for petitioner's stock in Today I Can. If petitioner's ownership interest in Today I Can had been nominal, Mr. Bell would not have agreed to pay her a substantial amount in exchange for that interest.[22]

On the record before us, we find that 49 percent of the 2003 Today I Can net income is attributable to petitioner. On that record, we further find that petitioner has failed to carry her burden of establishing that she satisfies all of the threshold conditions with respect to the portion of the underpayment for her taxable year 2003 that is attributable to that portion of that net income. See Rev. Proc. 2003-61, sec. 4.01(7). On the record before us, we find that petitioner has failed to carry her burden of establishing that it would be inequitable to hold her liable for the portion of that underpayment for her taxable year 2003 that is attributable to her 49-percent portion of the 2003 Today I Can net income. On that record, we find that petitioner has failed to carry her burden of establishing that she is entitled for her taxable year 2003 to relief under section 6015(f) with respect to that portion of that underpayment.

---

[22]In the property agreement, Mr. Bell agreed to pay petitioner $1 million, which was equal to approximately one-half of the gross receipts or sales that Today I Can reported in the 2003 Today I Can return.

With respect to the portion of the underpayment for peti-
tioner's taxable year 2003 that is attributable to petitioner's
wages of $24,500 that the Bells reported in the 2003 joint
return, petitioner asserts:

> In addition, the 2003 federal 1040 [the 2003 joint
> return] shows that the couple [the Bells] earned
> $53,000.00 in wages that were paid by Today I Can, Inc.
> This consisted of wages in the amount of $24,500 that
> were paid to petitioner and wages of $28,500 that were
> paid to the non-requesting spouse.  Thus, all income
> earned by the petitioner and nonrequesting spouse in
> 2003 was directly attributable to Today I Can, Inc.

It appears that petitioner is arguing that, because Today I
Can paid her $24,500 of wages during 2003 and because Mr. Bell
owned 100 percent of the stock of that company during that year,
those wages are attributable to him.  On the record before us, we
reject petitioner's argument.  Regardless of who owns a company,
an employee is taxed on the wages that the company pays to the
employee.  Petitioner agrees that during 2003 she performed
services for Today I Can and that during that year Today I Can
paid her wages of $24,500 for those services.

On the record before us, we find that the wages that Today I
Can paid petitioner during 2003 are attributable to petitioner.
On that record, we further find that petitioner has failed to
carry her burden of establishing that she satisfies all of the
threshold conditions with respect to the portion of the underpay-
ment for her taxable year 2003 that is attributable to those
wages.  See Rev. Proc. 2003-61, sec. 4.01(7).  On the record

before us, we find that petitioner has failed to carry her burden of establishing that it would be inequitable to hold her liable for the portion of the underpayment for her taxable year 2003 that is attributable to the wages that Today I Can paid her during that year. On that record, we find that petitioner has failed to carry her burden of establishing that she is entitled for her taxable year 2003 to relief under section 6015(f) with respect to that portion of that underpayment.

Respondent does not dispute that petitioner satisfies all of the threshold conditions with respect to the portion of the underpayment for petitioner's taxable year 2003 that is attributable to Mr. Bell.[23] Where the requesting spouse satisfies the threshold conditions, section 4.02(1) of Revenue Procedure 2003-61 sets forth the circumstances under which the Commissioner ordinarily will grant relief to that spouse under section 6015(f) in a case, like the instant case, where a liability is reported in a joint return but not paid. As pertinent here, those circumstances, which section 4.02 of Revenue Procedure 2003-61 and we refer to as elements, are:

---

[23]The portion of the underpayment for petitioner's taxable year 2003 that is attributable to Mr. Bell consists of the underpayment for that year attributable to (1) the wages of $28,500 that Today I Can paid Mr. Bell during that year, (2) the net business income of $2,195 from certain work Mr. Bell performed on behalf of Today I Can that the Bells reported in the 2003 joint return, and (3) Mr. Bell's 51-percent share of the 2003 Today I Can net income.

(a) On the date of the request for relief, the requesting spouse is no longer married to * * * the nonrequesting spouse * * *;

(b) On the date the requesting spouse signed the joint return, the requesting spouse had no knowledge or reason to know that the nonrequesting spouse would not pay the income tax liability.  The requesting spouse must establish that it was reasonable for the request-ing spouse to believe that the nonrequesting spouse would pay the reported income tax liability. * * *; and

(c) The requesting spouse will suffer economic hardship if the Service does not grant relief.  For purposes of this revenue procedure, the Service will base its determination of whether the requesting spouse will suffer economic hardship on rules similar to those provided in Treas. Reg. § 301.6343-1(b)(4). * * *

Rev. Proc. 2003-61, sec. 4.02(1), 2003-2 C.B. at 298.  (We shall hereinafter refer to the elements set forth in section 4.02(1)(a), (b), and (c) of Revenue Procedure 2003-61 as the marital status element, the knowledge or reason to know element, and the economic hardship element, respectively.)

With respect to the portion of the underpayment for peti-tioner's taxable year 2003 that is attributable to Mr. Bell,[24] (1) respondent concedes that the marital status element is present, and (2) the parties dispute whether the knowledge or reason to know element and the economic hardship element are present.

With respect to the knowledge or reason to know element, petitioner must establish that it was reasonable for her to

---

[24]See supra note 23.

believe that Mr. Bell would pay the tax shown due in the 2003 joint return.  See Rev. Proc. 2003-61, sec. 4.02(1)(b).  Respondent argues that on July 29, 2004, the date on which petitioner signed the 2003 joint return, she had knowledge or reason to know that Mr. Bell would not pay the tax shown due in that return with that return or within a reasonably prompt time.[25]  That is because, according to respondent:

> On July 29, 2004, petitioner (1) knew of the seven late-filed income tax returns [for the Bells' taxable years 1997, 1998, 1999, 2000, 2001, 2002, and 2003], (2) knew that the 2000 and 2002 joint income tax returns reported unpaid tax of $69,165.00, (3) knew or had reason to know that Mr. Bell had made payments towards the delinquent tax obligations for tax years 2000 and 2002 but that he had not remitted a payment towards the liability since March 2004, (4) knew or had reason to know that even after accounting for subsequent payments, the outstanding tax liabilities from tax years 2000 and 2002 were in excess of $30,000.00, in addition to penalties and interest, and (5) knew that the 2003 return reported a tax due of $49,331.00. [Cross-references omitted.]

---

[25]Respondent's argument that petitioner must believe that the tax would be paid in a reasonably prompt time is based on Banderas v. Commissioner, T.C. Memo. 2007-129.  In Banderas, we held that in order for a belief that a liability would be paid to be reasonable the requesting spouse must believe that the funds to pay the liability would be on hand within a reasonably prompt time.  Respondent contends that that holding in Banderas is wrong and that the requesting spouse must believe that the tax would be paid by the later of the date on which the return was filed or the date on which the tax is due to be paid.  We need not revisit our holding in Banderas as respondent invites us to do because, as discussed below, even under that holding we sustain respondent's argument with respect to the knowledge or reason to know element.

Petitioner counters that it was reasonable for petitioner to believe that Mr. Bell would pay the tax shown due in the 2003 joint return. According to petitioner:

> At the time petitioner signed the 2003 Joint Return, she knew there was a balance due. However, she understood that Tom [Mr. Bell] would pay all taxes due according to his statement to her. * * * At that time, Today I Can, Inc., * * * was in the midst of an impressive run of success. As shown on forms 1120S which were filed for tax years 2003 and 2004, Today I Can, Inc. had had total 2003 income of $2,040,413.00 and total 2004 income of $2,106,344. * * *
>
> Moreover, within the one year period prior to the filing of the 2003 1040 (i.e. 09/11/03 through 03/29/04), Tom Bell had tangibly demonstrated his ability and willingness to pay the tax liability as shown by the tax payments totaling $74,620.29 and had personally signed all the checks constituting those payments. Coupled with the fact that Tom Bell at that time was approximately forty years old and entering his prime earning years, any reasonable person would conclude, as did petitioner, that she would have no reason to believe that Mr. Bell would not or, more importantly, *could* not, make the payments. [Cross-reference and fn. ref. omitted.]

On the record before us, we reject petitioner's argument, the cornerstone of which is that Today I Can reported gross income of $2,040,413 and $2,106,344 for its taxable years 2003 and 2004, respectively. Petitioner's argument fails to take into account that Today I Can reported total deductions of $1,833,385 and $2,078,880 for those respective years. In addition, although petitioner is correct that between September 11, 2003, and March 29, 2004, Mr. Bell remitted certain payments to the Service that

it applied against the Bells' unpaid tax for each of their taxable years 1999, 2001, and 2002, after Mr. Bell made those payments there remained unpaid tax for the Bells' taxable year 2002, including certain penalties and interest, of approximately $40,500. Moreover, we have found that on July 29, 2004, the date on which petitioner signed the 2003 joint return, (1) petitioner signed the 2000 joint return in which the Bells showed tax due of $6,690 and (2) when the Bells filed that return a check for only $1,000 that was drawn on Mr. Bell's personal bank account was included with that return. In addition, when petitioner signed the 2003 joint return she was aware that (1) between September 11, 2003, and July 29, 2004, she and Mr. Bell had filed late respective tax returns for their taxable years 1997 through 2003; (2) the 2000 joint return showed tax due of $6,690 that they did not pay in full when they filed that return; (3) the 2002 joint return showed tax due of $83,475 that they did not pay in full when they filed that return; and (4) the 2003 joint return showed tax due of $50,587 that they did not pay in full when they filed that return. We have also found that in the property agreement petitioner acknowledged that she had "full and adequate knowl-edge" of all relevant financial information pertaining to Mr. Bell through July 10, 2004, the date on which petitioner executed that agreement. As a result, petitioner was or should have been aware on that date, which was only 19 days before she signed the

2003 joint return, that Mr. Bell had not paid in full the unpaid tax for the Bells' taxable year 2002 and that he had not made any payments to the Service since March 29, 2004, with respect to that unpaid tax.

On the record before us, we find that petitioner has failed to carry her burden of establishing that at the time she signed the 2003 joint return she reasonably believed that the tax shown due in that return would be paid on or before the date on which that tax was due. On that record, we further find that petitioner has failed to carry her burden of establishing that at that time she reasonably believed that the funds to pay the tax shown due in the 2003 joint return would be available within a reasonably prompt time.[26] On the record before us, we find that petitioner has failed to carry her burden of establishing that at the time she signed the 2003 joint return she did not know and had no reason to know that the tax shown due in that return would not be paid.

On the record before us, we find that petitioner has failed to carry her burden of establishing that she satisfies the requirements of the knowledge or reason to know element with respect to the portion of the underpayment for her taxable year 2003 that is attributable to Mr. Bell. See Rev. Proc. 2003-61, sec. 4.02(1)(b). On that record, we find that petitioner has

---

[26]See supra note 25.

failed to carry her burden of establishing that all of the elements of section 4.02 of Revenue Procedure 2003-61 are present with respect to that portion of that underpayment.[27]  See id., sec. 4.02(1).

Where, as here with respect to the portion of the underpayment for petitioner's taxable year 2003 that is attributable to Mr. Bell, the requesting spouse satisfies the threshold conditions but does not satisfy all of the requirements of section 4.02 of Revenue Procedure 2003-61, section 4.03 of that revenue procedure sets forth the following factors that are to be considered in determining whether a requesting spouse is entitled to relief under section 6015(f):  (1) Whether the requesting spouse is separated or divorced from the nonrequesting spouse (marital status factor); (2) whether the requesting spouse would suffer economic hardship if not granted relief (economic hardship factor); (3) whether the requesting spouse knew or had reason to know that the nonrequesting spouse would not pay the tax liability (knowledge factor); (4) whether the nonrequesting spouse has

---

[27]In the light of our finding that petitioner has failed to carry her burden of establishing that the knowledge or reason to know element is present, we need not address here whether the economic hardship element is present.  See Rev. Proc. 2003-61, sec. 4.02(1)(c).  In discussing below the factors contained in sec. 4.03 of Revenue Procedure 2003-61, we address whether petitioner would suffer an economic hardship if relief under sec. 6015(f) were not granted with respect to the portion of the underpayment for petitioner's taxable year 2003 that is attributable to Mr. Bell.

a legal obligation to pay the outstanding tax liability pursuant to a divorce decree or agreement (legal obligation factor); (5) whether the requesting spouse received a significant benefit from the unpaid tax liability (significant benefit factor); and (6) whether the requesting spouse has made a good faith effort to comply with the tax laws for the taxable years following the taxable year to which the request for such relief relates (compliance factor). Rev. Proc. 2003-61, sec. 4.03(2)(a), 2003-2 C.B. at 298.

Other factors that may be considered under Revenue Procedure 2003-61 are (1) whether the nonrequesting spouse abused the requesting spouse (abuse factor) and (2) whether the requesting spouse was in poor mental or physical health (mental or physical health factor) when he or she signed the tax return (return) or when he or she requested relief. Rev. Proc. 2003-61, sec. 4.03(2)(b). In the event (1) the nonrequesting spouse abused the requesting spouse or (2) the requesting spouse was in poor mental or physical health when he or she signed the return or when he or she requested relief, the abuse factor or the mental or physical health factor, as the case may be, will be taken into account. Id. However, where (1) the nonrequesting spouse did not abuse the requesting spouse and (2) the requesting spouse was not in poor mental or physical health when she signed the return or when she requested relief, those factors are not taken into account. Id.

In making our determination under section 6015(f), we shall consider all of the factors listed above and any other relevant factors. No single factor is to be determinative in any particular case, and all factors are to be considered and weighed appropriately.

With respect to the marital status factor, the parties agree that at the time of the trial in this case the Bells were divorced.

With respect to the economic hardship factor,[28] petitioner

---

[28]In determining whether a requesting spouse will suffer economic hardship, sec. 4.02(1)(c) of Revenue Procedure 2003-61 requires reliance on rules similar to those provided in sec. 301.6343-1(b)(4), Proced. & Admin. Regs. That regulation generally provides that an individual suffers an economic hardship if the individual is unable to pay his or her reasonable basic living expenses. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs., provides in pertinent part:

> (ii) Information from taxpayer.--In determining a reasonable amount for basic living expenses the director will consider any information provided by the taxpayer including--

> (A) The taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent of someone else;

> (B) The amount reasonably necessary for food, clothing, housing (including utilities, home-owner insurance, home-owner dues, and the like), medical expenses (including health insurance), transportation, current tax payments (including federal, state, and local), alimony, child support, or other court-ordered payments, and expenses necessary to the taxpayer's production of income (such as dues for a trade union or professional organization, or child care payments which allow the taxpayer to be gainfully employed);

(continued...)

claims on brief, and respondent does not dispute, that at the time of the trial in this case petitioner's monthly expenses included expenses for (1) rent of $875, (2) utilities of $425, and (3) food of $350.[29]  Respondent also does not dispute that (1) at the time of that trial petitioner was unemployed, (2) at that time petitioner's sister contributed $600 monthly toward the household expenses of petitioner and herself, and (3) from May 2009 until the time of the trial the only funds that petitioner had available on which to live were the payments that Mr. Bell

---

[28](...continued)
       (C) The cost of living in the geographic area in which the taxpayer resides;

       (D) The amount of property exempt from levy which is available to pay the taxpayer's expenses;

       (E) Any extraordinary circumstances such as special education expenses, a medical catastrophe, or natural disaster; and

       (F) Any other factor that the taxpayer claims bears on economic hardship and brings to the attention of the director.

[29]Petitioner claims on brief that the expenses listed in the text do not include her additional expenses for transportation and medical care.  Petitioner does not identify the specific nature and the amount of each of those respective expenses.  It appears that (1) petitioner's transportation expenses would include expenses for gasoline and repairs and insurance on the Ford Expedition that she owned and (2) petitioner's medical expenses would include the outstanding bills that she had at the time of the trial in this case for medical care that had been provided to her before 2008.  Petitioner does not claim, and the record does not establish, whether at the time of that trial petitioner continued to have the clothing expense that she claimed in her Form 12510.

had made pursuant to the bankruptcy settlement totaling $19,500 and certain savings, the amount of which is not established by the record.[30]  Instead, respondent argues:

> Under the terms of a settlement agreement with Mr. Bell in his bankruptcy proceeding [the bankruptcy settlement], petitioner is entitled to receive $4,250.00 per month for twelve months and then $3,000.00 per month for 88 months, beginning in November 2009.  Since October 2009, Mr. Bell has paid petitioner $19,500.00.  The agreement further specifies that upon default the terms of the original Installment Note [the 2004 installment note] shall revive and be of full legal force and effect.  Because Mr. Bell is currently in default on this agreement, petitioner is entitled to collect the amounts due under the original installment note of $10,000.00 per month.  Petitioner's right to collect the amounts due under this installment note is an asset which petitioner is entitled to pursue to pay her 2003 joint income tax obligation. * * * [Cross-references omitted.]

On the record before us, we reject respondent's argument with respect to the economic hardship factor.  Respondent's argument ignores respondent's concession that Mr. Bell is in default on the bankruptcy settlement.  In addition, we have found (1) that from around February 2010 to the time of the trial in this case, a period of approximately three months, Mr. Bell did not make any monthly payments pursuant to the bankruptcy settlement, (2) that, of the $19,500 that Mr. Bell paid pursuant to the bankruptcy settlement between October 2009 and January 2010, petitioner used $9,000 to pay her attorney, and (3) that as of

---

[30]At the time of the trial, petitioner's savings had been reduced to approximately $100.

April 2, 2008, the date on which petitioner filed petitioner's bankruptcy complaint, Mr. Bell had not made any payments under the 2004 installment note.

It is reasonable to conclude on the basis of the facts that we have found regarding Mr. Bell's respective payment histories under the 2004 installment note and the bankruptcy settlement that Mr. Bell is unlikely to make voluntarily the payments required by that note and that settlement. It is also reasonable to conclude on the basis of those facts that it is likely (1) that petitioner will be required to maintain court proceedings against Mr. Bell in order to attempt to collect the respective unpaid amounts under the 2004 installment note and the bankruptcy settlement and (2) that any such legal actions will require petitioner to retain and pay an attorney to represent her. We are unable to conclude, however, on the basis of the facts that we have found that petitioner will in fact be able to collect those unpaid amounts from Mr. Bell.

It is also significant to our consideration of the economic hardship factor that we have found that (1) since 2008 when Earn and Learn was dissolved until the time of the trial in this case petitioner has been unemployed, (2) around 1990 petitioner suffered petitioner's back injury, (3) in 1995 petitioner underwent back surgery for that back injury during which metal rods were inserted in her back, (4) as of the time of the trial in

this case petitioner continued to suffer from petitioner's back injury in that she was unable to stand, sit, walk, or lie down for long periods, and (5) at that time petitioner was approaching 60 years of age. It is reasonable to conclude on the basis of those facts that it is unlikely that petitioner will be able to rejoin the workforce. Even if petitioner were able to collect from Mr. Bell any respective unpaid amounts under the 2004 installment note and the bankruptcy settlement, we believe on the record before us that she would be using any such amounts in order to pay her basic living expenses for the remainder of her life.

In addressing the economic hardship factor, we have in mind that petitioner's monthly expenses totaling $1,650 do not include certain expenses that petitioner likely incurred or would have incurred in the absence of her current financial difficulties. First, at the time of the trial in this case petitioner had certain outstanding bills in amounts not established by the record for medical care that was provided to her before 2008.[31] Second, petitioner's monthly expenses do not take into account any expenses with respect to the Ford Expedition that she owned even though she presumably incurred and will continue to incur

---

[31]See supra note 29.

expenses for that vehicle, such as gasoline.[32]  Third, (1) from around 2003 until the time of the trial in this case petitioner did not maintain any health insurance and (2) since 2008 petitioner has not sought treatment for any medical condition, including petitioner's back injury, because she was unable to afford any such treatment.  Fourth, petitioner's monthly expenses do not take into account that petitioner remains liable for the Bells' respective unpaid taxes for their taxable years 2000 and 2002, which as of April 19, 2010, totaled $11,963.39, and $36,895.25, respectively.  Nor do petitioner's monthly expenses take into account that we have found that petitioner has failed to carry her burden of establishing that she is entitled to relief under section 6015(f) with respect to, and that therefore she remains liable for, the respective portions of the underpayment for her taxable year 2003 that are attributable to (1) petitioner's 49-percent share of the 2003 Today I Can net income and (2) the wages of $24,500 that Today I Can paid her during 2003.

On the record before us, we find that petitioner has carried her burden of establishing that she would suffer economic hardship if relief under section 6015(f) were not granted with respect to the portion of the underpayment for her taxable year 2003 that is attributable to Mr. Bell.

---

[32]See supra note 29.

With respect to the knowledge factor, we have found that petitioner has failed to carry her burden of establishing that at the time she signed the 2003 joint return she did not know and had no reason to know that the tax shown due in that return would not be paid.

With respect to the legal obligation factor, section 4.03(2)(a)(iv) of Revenue Procedure 2003-61 provides that that factor "will not weigh in favor of relief if the requesting spouse knew or had reason to know, when entering into the divorce decree or agreement, that the nonrequesting spouse would not pay the income tax liability." Although respondent does not dispute that under the property agreement Mr. Bell is legally obligated to pay the remaining unpaid tax for the Bells' taxable year 2003, respondent argues that at the time petitioner executed the property agreement petitioner "knew or had reason to know that Mr. Bell would not pay the outstanding joint income tax liabilities."

We have found (1) that on July 10, 2004, petitioner and Mr. Bell executed and filed with the Superior Court the property agreement, and (2) that on July 29, 2004, the Bells jointly filed late the 2003 joint return. On the record before us, we find that when petitioner and Mr. Bell executed the property agreement petitioner was not aware of the contents of the 2003 joint return or that that return would show tax due. On that record, we find that at the time petitioner executed the property agreement she

did not know and had no reason to know that the tax shown due in the 2003 joint return would not be paid.

With respect to the significant benefit factor, respondent argues that petitioner "received a significant benefit from the nonpayment of the 2003 tax liability." That is because, according to respondent:

> All of petitioner's personal bills were paid from the personal checking account at Union Planters Bank [Mr. Bell's personal bank account] while she was married to Mr. Bell. This account also shows checks totaling $13,500.00 were paid directly to petitioner during 2003. As all of petitioner's personal bills were paid from the checking account, this $13,500.00 was completely at her disposal, and amounted to twenty-six percent of the unpaid income tax liability for 2003. * * * [Cross-references omitted.]

On the record before us, we reject respondent's argument that the checks drawn on Mr. Bell's personal bank account totaling $13,500 that petitioner received during 2003 constituted a significant benefit. We have found (1) that during their marriage the Bells did not maintain any bank account in their joint names and petitioner did not maintain any bank account in her sole name and (2) that petitioner deposited the wages of $24,500 that Today I Can paid her during 2003 into Mr. Bell's personal bank account, an account over which petitioner did not have signatory authority. We consider the $13,500 in checks drawn on Mr. Bell's personal bank account that Mr. Bell issued to petitioner during 2003 to have been petitioner's own money, since during that year she deposited into that account her wages of

$24,500. Moreover, it is reasonable to conclude on the record before us that petitioner needed some cash in order to pay certain normal living expenses, such as buying certain meals outside the marital residence, buying gasoline for her Ford Expedition, buying certain personal effects, and buying certain services and products at the beauty parlor. It is also reasonable to conclude on the record before us that the only means by which petitioner was able to obtain funds in order to pay those types of normal living expenses was to cash the checks drawn on Mr. Bell's personal bank account that he issued to her. On the record before us, we find that petitioner did not receive a significant benefit beyond normal support from the Bells' failure to pay the tax shown due in the 2003 joint return.

With respect to the compliance factor, petitioner must establish that she made a good faith effort to comply with the tax laws after her taxable year 2003, the year at issue. We have found that on September 10, 2007, petitioner timely filed her 2006 return in which she showed tax due of $59,668 and with which she included a payment of $59,668. We have also found that on October 20, 2008, petitioner filed her 2007 return in which she claimed, inter alia, a refund of approximately $9,700. Petitioner's tax for her taxable year 2006 was due on April 15, 2007, see sec. 6151, and her payment of that tax on September 10, 2007, was approximately five months late. Petitioner paid the tax shown due in the 2006 return at the time that she filed that

return. Although petitioner's 2007 return was due on October 15, 2008, she did not file that return until October 20, 2008. However, it is not clear from the record whether that return was timely filed. See sec. 7502. In any event, petitioner claimed a refund in her 2007 return. We also note that both respondent's examiner and respondent's Appeals officer found that petitioner had made a good faith effort to comply with the tax laws after her taxable year 2003, despite the fact that petitioner had paid late the tax for her taxable year 2006. On the record before us, we find that petitioner made a good faith effort to comply with the tax laws after the year at issue.

With respect to the abuse factor, we have found that at no time during their marriage did Mr. Bell physically abuse petitioner. In petitioner's Form 12510, she claimed that Mr. Bell verbally and mentally abused her. In support of that claim, petitioner relies on her testimony at trial that

> We didn't always agree on everything he did. I guess I came from the old school that you were to treat your spouse -- I mean that the husband ran the family and that's what I believed, you know. So I -- I argued and he would get very verbally abusive and he didn't care who or what was around. You know, it didn't matter.

We are unable to find on the basis of petitioner's above-quoted testimony that Mr. Bell verbally or mentally abused her during their marriage. On the record before us, we find that petitioner

has failed to carry her burden of establishing that during their marriage Mr. Bell verbally and mentally abused her.

With respect to the mental or physical health factor, we have found that (1) around 1990 petitioner suffered petitioner's back injury, (2) in 1995 petitioner underwent back surgery for that back injury during which metal rods were inserted in her back, (3) as of the time of the trial in this case petitioner continued to suffer from petitioner's back injury in that she was unable to stand, sit, walk, or lie down for long periods, and (4) petitioner stopped receiving medical treatment for that back injury in 1997. We have also found that at the time of the trial petitioner had not sought treatment for any medical condition since 2008 because she was unable to afford any such treatment. On the record before us, we find that petitioner was in poor physical health when (1) the Bells filed the 2003 joint return, (2) she filed Form 8857, and (3) the trial in this case took place.

Based upon our examination of the entire record before us, we find that petitioner has carried her burden of establishing that it would be inequitable to hold her liable for the portion of the underpayment for her taxable year 2003 that is attribut- able to Mr. Bell. On that record, we further find that peti-

tioner has carried her burden of establishing that she is entitled to relief under section 6015(f) for that portion of that underpayment.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

Decision will be entered

under Rule 155.